1

2

3

4

5

6

7

8

9                IN THE UNITED STATES DISTRICT COURT

10                   FOR THE DISTRICT OF OREGON

11  TAMMY H. GALBREATH,              )
                                     )
12                 Plaintiff,        )
                                     )     No.  CV-04-1001-HU
13        v.                         )
                                     )
14  COMMISSIONER OF SOCIAL           )
    SECURITY,                        )     FINDINGS & RECOMMENDATION
15                                   )
                   Defendant.        )
16  _____)

17  Tim Wilborn
    WILBORN & ASSOCIATES, P.C.
18  2020-C SW 8th Avenue, PMB #294
    West Linn, Oregon 97068-4612
19
            Attorney for Plaintiff
20
    Karin J. Immergut
21  UNITED STATES ATTORNEY
    District of Oregon
22  Craig J. Casey
    ASSISTANT UNITED STATES ATTORNEY
23  1000 S.W. Third Avenue, Suite 600
    Portland, Oregon 97204-2902
24
    Stephanie R. Martz
25  SPECIAL ASSISTANT UNITED STATES ATTORNEY
    Office of the General Counsel
26  Social Security Administration
    701 5th Avenue, Suite 2900 M/S 901
27  Seattle, Washington 98104-7075

28          Attorneys for Defendant

    1 - FINDINGS & RECOMMENDATION

HUBEL, Magistrate Judge:

Plaintiff Tammy Galbreath brings this action for judicial review of the Commissioner's final decision to deny supplemental security income (SSI). This Court has jurisdiction under 42 U.S.C. §§ 405(g) (incorporated by 42 U.S.C. § 1383(c)(3)). I recommend that the Commissioner's decision be reversed and remanded for further consideration by the ALJ.

PROCEDURAL BACKGROUND

Plaintiff applied for SSI on June 11, 2001, alleging an onset date of October 1, 1999. Tr. 60, 61. Her application was denied initially and on reconsideration. Tr. 29, 30, 31-35, 38-40.

On December 12, 2002, plaintiff, represented by counsel, appeared for a hearing before an Administrative Law Judge (ALJ). Tr. 319-64. On March 25, 2003, the ALJ found plaintiff not disabled. Tr. 15-28. The Appeals Council denied plaintiff's request for review of the ALJ's decision. Tr. 5-9.

FACTUAL BACKGROUND

Plaintiff initially alleged disability based on an inability to understand and follow instructions. Tr. 68. She presently contends that she is disabled based on combined impairments, including borderline intellectual functioning, depression, hand numbness, and a somatoform disorder. Pltf's Op. Brief at p. 2. At the time of the December 12, 2002 hearing, plaintiff was twenty-two years old. Tr. 61 (showing June 9, 1980 birthdate). She has a "modified" high school diploma, suggesting she graduated from high school, but with the assistance of the "resource room." Tr. 329. She has no past relevant work. Tr. 25.

I. Medical Evidence

2 - FINDINGS & RECOMMENDATION

The relevant medical records begin in January 2000 when plaintiff was seen by Physician's Assistant Mitchell Wilson for resumption of Depo-Provera. Tr. 173.[1] Wilson noted that plaintiff had been on birth control pills for about one month, but had had a hard time remembering to take them regularly. Id. He administered a Depo-Provera injection and instructed her to return in three weeks. Id.

Plaintiff saw Wilson again on January 14, 2000 for a Special Olympics history and physical. Tr. 263. Wilson's chart note states that plaintiff has a history of mild mental retardation, has an infant son, but is adequately "plugged into" social services, and that there was no restriction on her participation in Special Olympics activities which could even be beneficial to her mechanical low back pain. Id.

In February 2000, Dr. Sonia J. Schuemann, M.D., apparently with The Dalles Clinic, examined plaintiff for a "CBNH" physical. Id. She noted that the physical was routine except for plaintiff's poor dentition, and there were no contraindications to working at the nursing home. Id.

In June 2000, plaintiff complained of low back pain which was

---

[1] The List of Exhibits identifies records appearing at pages 246-82 as being from The Dalles Clinic, including several chart notes from Wilson and other practitioners. The chart notes themselves lack any particular clinic affiliation. Most of these chart notes are repeated at pages 163-85 which are identified as being chart notes by Wilson with no indication of a clinic affiliation. I assume that all of Wilson's chart notes, even if not identified as such, are from his practice at The Dalles Clinic. I further assume that all chart notes appearing at pages 246-82 are made by practitioners associated with The Dalles Clinic.

3 - FINDINGS & RECOMMENDATION

diagnosed as sacroiliitis.  Tr. 261.  She received Relafen and Vicodin for pain.  Id.  She received refills of Vicodin in September and October 2000 for the low back pain, and for abdominal pain of which she complained in August 2000.  Tr. 259-60.  She received Vioxx in addition to Vicodin in February 2001 for an aggravation of the sacroiliitis triggered by a sudden movement. Tr. 256.

In March 2001, plaintiff saw Wilson for complaints of light headedness, visual "black-outs" and nausea.  Tr. 255.  She also complained of dysesthesias of the right wrist and hand which were worse at night.  Id.  Her medications at the time included occasional Vicodin for back pain.  Id.

Wilson performed a screening for depression and noted that over the previous six months, plaintiff experienced a sad mood with frequent crying spells, and also had significant anhedonia, fatigue, insomnia, decreased concentration, decreased appetite, guilty ruminations, and psychomotor vegetation.  Id.  He diagnosed her with a major depressive episode.  Id.  He prescribed the anti-depressant Effexor.  Id.

Later that month, plaintiff returned to see Wilson and stated that she stopped taking the Effexor because she vomited.  Tr. 254. She requested a prescription for Vicodin for migraine headaches. Id.  She complained of continued right hand numbness, but without pain, overuse, or trauma.  Id.

Physical examination of the right hand showed no erythema, edema, deformity, or pallor.  Id.  She had good grip strength and her intrinsic muscle strength was intact.  Id.  Her vascular exam was intact, but she had a decreased sensation to pin prick, in a

4 - FINDINGS & RECOMMENDATION

glove type pattern, with no particular dermatomal distribution. Id.

Wilson assessed plaintiff as having dysesthesia in the right hand, "in a [patient] with suspected depression and a [history] of somatization." Tr. 254. He stated that the existence of some carpal tunnel syndrome, "with the [patient] simply embellishing some of the symptoms" should be considered. Id.

He prescribed a wrist splint for her right hand to wear around the clock. Id. She was to return in two weeks if her symptoms did not improve. Id. He denied her request for Vicodin, but prescribed Zomig for treatment of migraine headache pain. Id.

On April 19, 2001, Wilson noted that plaintiff had complained of headaches and had experienced orthostatic hypotension and depression since a fall 2000 motor vehicle accident. Tr. 253. He further noted that her work-up has been "essentially unremarkable." Id. He explained that plaintiff had stated in an earlier visit that she discontinued her Effexor, initially prescribed in March 2001, because of nausea and vomiting, but that during the April 19, 2001 examination, she told him that she had just run out of the medication. Id. She denied having any gastrointestinal side effects. Id. Wilson discussed medication compliance with her. Id.

He again denied plaintiff's request for Vicodin. Id. He explained that he believed her headaches and orthostatic hypotension were due to "autonomic dysfunction, probably from her [motor vehicle accident] and her depression." Id. He gave her a new Effexor starter pack and some ibuprofen. Id. There is no mention of her right hand numbness in this chart note. Id.

5 - FINDINGS & RECOMMENDATION

On April 27, 2001, plaintiff was seen by Family Nurse Practitioner Jennifer Hanlon, apparently at The Dalles Clinic. Tr. 252. She complained of depression and "shakiness" which she indicated was caused by the Effexor that Wilson had given her on April 14, 2001. Id. She apparently had been to the emergency room the previous day and requested that Hanlon give her more diazepam which the emergency staff had given her. Id.

Plaintiff told Hanlon that since October 2000, she had daily bad moods, difficulty sleeping, tearfulness, irritability, and what Hanlon described as anhedonia. Id. She denied being suicidal. Id. She also complained about frequent migraines, stating that Vicodin was the only medication that worked for the headache pain, but indicating that she was unable to obtain any. Id.

Hanlon described plaintiff as being somewhat reticent but generally cooperative and with a low affect. Id. She described her situation as "complicated." Id. Hanlon noted that plaintiff did "carry a [diagnosis] of adjustment disorder, with depressed mood," and "certainly [had] some features of depression." Id. Hanlon prescribed Zoloft and stated that plaintiff was due to see "Dr. Irvine" in about two weeks. Id.

The next relevant chart note from the clinic is dated September 21, 2001, by Hanlon. Tr. 250. Hanlon reported that plaintiff came in for a complete physical exam. Id. Plaintiff stated that she was trying to get pregnant, despite the fact that her two-year old son was in state custody. Id. She was unemployed and not taking prenatal vitamins or any other medications. Id. Her history included "[n]otable for learning disability[.]" Id. Hanlon noted that her gynecological exam was normal, but that

6 - FINDINGS & RECOMMENDATION

plaintiff was "challenged by poor learning and judgement skills." Id. Hanlon tried to engage her in a discussion about the wisdom of attempting pregnancy in her current situation, but also informed her that if she was at risk for pregnancy, she should be taking a daily prenatal vitamin with folate. Id.

On December 10, 2001, Dr. Brendon R. Irvine, M.D., examined plaintiff for a follow-up of abdominal pain. Tr. 249. She was currently taking Zantac and Permethazine. Id. She reported not sleeping, having an increased appetite, and having decreased enjoyment. Id. Dr. Irvine assessed her as having abdominal pain with an unclear etiology. Id. He noted her history of amenorrhea, but with normal labs and normal ultrasounds. Id. He prescribed Triphasil to regulate her periods and Wellbutrin for her adjustment disorder with depressed mood. Id.

On September 10, 2002, plaintiff was examined by Dr. Robert Mishra, M.D., apparently at The Dalles Clinic, for management of depression and low back pain. Tr. 248. She was two weeks post-partum and reported a long history of right sided muscular back pain. Id. Dr. Mishra reported that Dr. Irvine had investigated the back pain and thought it to be minor nerve irritation. Id. Dr. Mishra noted that plaintiff managed her symptoms with one or two Vicodin per day, using between thirty and fifty in a month. Id. Plaintiff requested a referral to a chiropractor. Id.

In regard to her depression, Dr. Mishra noted that plaintiff had a long history of major depression which had responded well in the past to Effexor. Id. She had not taken it during her pregnancy and wanted to start again. Id.

On examination, Dr. Mishra found plaintiff's affect to be

7 - FINDINGS & RECOMMENDATION

appropriate and noted some pain in the right buttock area which seemed to radiate from the low back and which could be radicular in origin. Id. He assessed her as having mild depression and chronic low back pain. Id. He gave her samples of Effexor, enough to last one month, Vicodin, and a referral to a chiropractor. Id.

On October 22, 2002, Dr. Mishra prescribed a continuing course of Effexor to help with the symptoms of plaintiff's depression. Tr. 246.

During the time plaintiff was being treated at The Dalles Clinic from January 2000 to October 2002, she was evaluated at the request of her Vocational Rehabilitation Counselor on March 20, 2001, by psychologist Jim Greenough, Ph.D. Tr. 157-62. During the evaluation, he administered the following tests: Wechsler Adult Intelligence Scale-III, Wide Range Achievement Test-3, and the Wechsler Individual Achievement Test. Tr. 159.

Test results placed plaintiff in the borderline range of intellectual ability. Id. She obtained verbal and performance IQs of 72 and 80, summarized in a full scale IQ of 74. Id. Supplementary index scores ranged from a low of 70 on verbal comprehension to a high of 84 on perceptual organization. Id. Processing speed and working memory were in the mid to upper end of the borderline range. Id. Dr. Greenough noted that plaintiff's scores were "pretty consistent," and that it was his impression that plaintiff made a good effort, leading him to believe that this was a reasonable estimate of plaintiff's abilities. Id.

Plaintiff's academic achievement was uniformly low, though not low enough to document a learning disability in view of the intellectual limitations. Id. Plaintiff's word recognition

8 - FINDINGS & RECOMMENDATION

reading was at the fourth grade level and at a standard score of 69; math was at the third grade level at a standard score of 65; spelling was at the fifth grade level, at a standard score of 73. Tr. 159-60. Additional testing with the Wechsler Individual Achievement Test tended to confirm the general range of results on the Wide Range Achievement Test-3. Tr. 160.

Dr. Greenough diagnosed plaintiff as having borderline intellectual ability and narcissistic and perhaps self-defeating personality characteristics. Id. He found her Global Assessment of Functioning (GAF) to be 50. Id. In the findings and recommendations section of his report, Dr. Greenough noted that he offered no diagnosis in regard to what plaintiff reported as "depression spells." Tr. 161. He indicated he could not assess what was involved. Id. Plaintiff reported these as "seizures" but, Dr. Greenough noted, there was no medical evidence documenting a seizure disorder. Id.

Dr. Greenough stated that there were "some personality characteristics of note." Id. He noted that plaintiff tended to blame others for most of her difficulties, and that there may be some narcissistic features reflected in her tendency to focus on herself and her own needs to the exclusion of those around her. Id. Finally, he noted that she wanted to work soon. but was in too much of a hurry to consider training options. Id. He stated that if she did eventually want training, her goal of becoming a certified nurse's assistant seemed feasible, although she might require some assistance with test taking and the more academic aspects of training. Id. At the time Dr. Greenough examined her, he thought that the most that could be offered would be some

9 - FINDINGS & RECOMMENDATION

assistance in finding a job, assistance in presenting herself on application, and perhaps some coaching in regard to ways to hold a job and resolve conflicts which arise on the job.  Id.

In September 2001, Disability Determination Services (DDS) professionals offered assessments of plaintiff's functioning.  Tr. 186-203.  On September 28, 2001, DDS psychologist Paul Rethinger, Ph.D., completed a Psychiatric Review Technique (PRT) form indicating that a residual functional capacity (RFC) was necessary based on plaintiff's borderline intellectual functioning.  Tr. 186-87.  In the functional limitations section of that form, Dr. Rethinger assessed plaintiff as having mild restrictions in daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  Tr. 196.

On that same date, Dr. Rethinger completed a mental RFC assessment.  Tr. 200-03.  Dr. Rethinger found plaintiff to be markedly limited in her ability to understand and remember detailed instructions, and moderately limited in her ability to carry out detailed instructions, in her ability to interact appropriately with the general public, and in her ability to set realistic goals or make plans independently of others.  Tr. 200-02.  In Dr. Rethinger's opinion, plaintiff was not significantly limited in any other mental functional capacity.  Id.

In January 2002, a different DDS psychologist completed another PRT form and another mental RFC assessment of plaintiff.  Tr. 209-26.  Bill Hennings, Ph.D., also indicated that an RFC assessment was necessary based on plaintiff's borderline intellectual functioning.  Tr. 209-10.  In the functional

10 - FINDINGS & RECOMMENDATION

limitation section of the PRT form, he rated plaintiff as having mild restrictions of activities of daily living and in maintaining social functioning, and as having moderate difficulties in maintaining concentration, persistence, or pace. Tr. 219.

In the mental RFC, Dr. Hennings assessed plaintiff as being moderately limited in the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to interact appropriately with the general public, and the ability to set realistic goals or make plans independently of others. Tr. 223-24. He opined that plaintiff was not significantly limited in any other mental function. Tr. 224.

In January 2002, plaintiff received an "Individual Support Plan" from the Developmental Disabilities Program at the Mid-Columbia Center for Living. Tr. 236. It suggests that plaintiff was to be placed at the Columbia Gorge Center for job development and support. Id. At the time, her listed medications were only prenatal vitamins. Tr. 237. Her long range goal was identified as being employed in the community, doing housekeeping. Tr. 238. In the short term, she was to answer phones at "TDWS" on Thursdays, with additional days a possibility. Id. She was to learn job search skills by attending a "job club," working with the Employment Coordinator, and watching informative videos on job development. Id. The comment section at the end of the Individual Support Plan states that plaintiff was interested in pursuing a certified nurse's aide certificate in the future but, because she was pregnant at the time, she did not believe that it would be beneficial to pursue it. Tr. 241.

11 - FINDINGS & RECOMMENDATION

Staff at the Columbia Gorge Center completed an "Employability Assessment Report" regarding plaintiff on January 22, 2002. Tr. 230-32. The author of the report was able to obtain a copy of plaintiff's high school records showing that plaintiff was at the third grade benchmark, with the ability to add, subtract, multiply, and divide up to three digits. Tr. 230. In high school, she received training regarding writing checks, balancing a check book, paying bills, and budgeting household money. Id.

The author stated that plaintiff's work history was extremely limited consisting of four jobs, none lasting more than three months. Id. Reasons for termination from these positions including non-compliance of company cleaning policies, frequent illness, and accusations of theft which were not prosecuted due to inconclusive evidence. Id. Her transferable skills were identified as housekeeping duties and child care, as well as the ability to answer a multi-line phone system and take legible messages. Tr. 231.

The author reported that plaintiff expressed concern that she would be unable to obtain or maintain community employment due to past temper explosions followed by black outs. Id. The author was unable to find any documentation to support these episodes. Id. Finally, the author recommended that before proceeding with job development, plaintiff go through some neurological testing to address the question of black outs, and that she continue to work at the Columbia Gorge Center where she could be closely monitored and receive the support necessary to build employment skills. Tr. 232.

A November 2002 Progress Report states that plaintiff attended

12 - FINDINGS & RECOMMENDATION

the Columbia Gorge Center from January 28, 2002 to June 30, 2002, participating in a situational assessment at the reception desk. Tr. 229. Plaintiff had difficulty following simple directions and staying on task. Id. She had to be reminded repeatedly not to make personal phone calls and talk to friends while she was working. Id. She also missed excessive time from work without calling to notify her supervisor. Id. The author of the Progress Report stated that it was the finding of the Columbia Gorge Center that due to plaintiff's prior work history, consisting of several extremely short stay positions that all resulted in her being terminated for various reasons, and the Center's assessment, it would be extremely unlikely that plaintiff would either obtain or maintain gainful employment. Id.

As part of her experience at the Columbia Gorge Center and the Mid-Columbia Center for Living Developmental Disabilities Program, plaintiff was evaluated in May 2002 by psychologist Lawrence J. Lyon, Ph.D. Tr. 227-29. Dr. Lyon referred to prior evaluations performed by him, but none are in the Administrative Record. Tr. 227, 228 (referring to prior evaluations in general and noting an examination on July 28, 1998). It appears that plaintiff's mother, Teresa Taketa, was present during the evaluation. Id.

Dr. Lyon noted that when he examined plaintiff in July 1998, she achieved a Verbal Scale IQ score of 71, a Performance Scale IQ score of 81, and a Full Scale IQ score of 74. Tr. 228. In May 2002, Dr. Lyon reported that "[t]he Vineland Adaptive Behavior Scales: Interview Addition Survey Form was completed with" plaintiff's mother "serving as respondent." Id. The following scores were obtained: "(Standard Score Mean = 100, Standard

13 - FINDINGS & RECOMMENDATION

Deviation = 15):

| Domain | Standard Score | Age Equivalent |
|--------|---------------|----------------|
| Communication | 39 | 8-1 |
| Daily Living Skills | 80 | 13-9 |
| Socialization | 44 | 5-9 |
| Adaptive Behavior Composite | 50 | |

Id.

Dr. Lyon stated that based on the current Vineland scores, in conjunction with plaintiff's earlier intellectual scores, it was appropriate to revise the estimate of her intellectual functioning to the "Mildly Retarded range (DSM-IV code: 317)." Id. He noted that while plaintiff appeared to have better-developed adaptive skills in some areas, it was clear that in the areas of communication and socialization she functioned in the mentally handicapped range. Id. Dr. Lyon believed plaintiff was eligible for developmental disability services under the current guidelines. Id. He stated that she continued to have major problems with decision-making and social judgment, and would benefit from ongoing counseling and case management. Id.

A May 31, 2002 "Diagnosis and Evaluation Services Eligibility Summary" is listed in the Administrative Record's List of Exhibits as having been prepared by Mid-Columbia Center for Living Developmental Disabilities Program, although there is no such identifying information on the document itself. Tr. 3, 242-45. The Summary indicates that plaintiff was eligible for certain unspecified services by virtue of having an IQ between 70-75, with an adaptive assessment that verified mental retardation. Tr. 242. An attachment to the Summary shows that certain data were reviewed in making the eligibility determination, including psychometric

14 - FINDINGS & RECOMMENDATION

testing administered at ages 10, 12, and 18, and adaptive
assessments administered at ages 10, 12, and 21. Tr. 244. The
earlier full scale IQ scores were 62-72 at age 10, 64 at age 12,
and 74 at age 18. Id. The composite adaptive assessment scores
were 79 (classroom) at age 10, 73 (based on interview with mother)
at age 10, and 72 at age 12. Id.

II. Medical Expert Testimony

Psychologist Robert Davis, Ph.D. testified at the hearing as
a medical expert. Dr. Davis indicated that plaintiff had
borderline intelligence and a diagnosis of mild mental retardation.
Tr. 349-50. He noted her improvement over the years in certain of
her IQ scores and explained that IQ scores often improve as one
matures because the "social component of IQ is buttressed somehow
by life experience and full maturity, and so a person that's 18
might appear to be of very low IQ and by the time they're 25 you
see a substantial difference and improvement, and it seems to me
that she's already demonstrating that." Tr. 350. He characterized
the improvement as "quite dramatic." Id. He also noted that her
performance IQ was "very close to the normal range[]" which was
significant because it measures the "skills that one typically uses
in non-social-contact type of jobs in things like . . . assembly or
mechanical things . . . [, or] things that involve organization and
hand-eye coordination[.]" Tr. 351.

Dr. Davis also opined that much of the medical evidence was
focused on plaintiff's low IQ and that there had not been an
adequate study of her emotional disturbance, if any. Tr. 348. He
concluded, based on the evidence to date, that she did not meet the
listings for a medical disturbance, but he was concerned with Dr.

15 - FINDINGS & RECOMMENDATION

Lyon's May 2002 finding that plaintiff's socialization was at an age six level. Tr. 348-49. Dr. Davis expressed doubt about that finding and noted that it was questionable because it was based on an interview with plaintiff's mother whose own disabilities could impact the credibility of her information. Tr. 349.

Dr. Davis explained that there were essentially two choices:

> Either there's no medically significant disturbance here and she does not meet the listings at all or we don't have adequate information. I think the latter is true and would hope that some further study --

Id.

Dr. Davis also testified about the relationship between certain test scores and corresponding IQ percentiles. Tr. 351-53. This testimony is discussed below.

III. Plaintiff's Testimony

Plaintiff testified that her math skills are poor, although she can add and subtract. Tr. 329. Her name is on the checking account, but her husband apparently maintains it. Id. She has a driver's license, although at the time of the hearing it had been suspended for driving without insurance. Tr. 330. She obtained her license at age 18, after taking a written test instead of a computer test. Id. She passed the written test on the second try, having repeatedly failed the computer version of the test. Id.

Plaintiff explained that she was on SSI as a minor because of a learning disability. Tr. 332. She stated that she cannot read or spell well. Id. When she turned 18, she had to re-apply for SSI benefits. Id.

At the time of the hearing, plaintiff had a four-month old daughter and her last job was answering phones at the Columbia

16 - FINDINGS & RECOMMENDATION

Gorge Center in June 2002. Tr. 324, 327. She testified that she was staying home and taking care of her baby. Tr. 332.

She indicated that her older child was in state custody, although apparently residing with the child's father. Tr. 326. She testified that there was no chance she would lose custody of her new baby because she gets support from her husband and her husband's family was able to support her as well. Tr. 333-34. She has learned to take a break to relax before her "temper gets too high" by calling family members who will take the baby for a couple of hours. Tr. 334. In addition to taking care of her baby, she also cleans house and cooks dinner. Id.

In response to questioning from Dr. Davis, plaintiff indicated that her temper did not interfere with her ability to work in any of her previous jobs or her job placement because she was on anti-depressant medication and it controlled her temper as well as her depression. Tr. 346. She noted that when she took Effexor, it "cleared up" her temper which would flare when she was depressed. Id. She explained that she had stopped taking Effexor on a regular basis, but that she only took it once in awhile when her depression was "really bad." Tr. 347.

IV. Lay Witness Testimony

Plaintiff's mother Teresa Taketa also testified at the hearing. She testified that plaintiff has a learning disability, that she was in special education in school, and did not graduate with a regular high school diploma, but received a modified diploma. Tr. 338. Taketa stated that plaintiff's math skills were not very good. Id.

Taketa explained that she herself was on SSI because it was

17 - FINDINGS & RECOMMENDATION

hard for her to learn. Tr. 339. She stated that she did not think plaintiff could support herself with full-time work because she would not be able to manage living by herself and have someone available to help with the baby. Tr. 341. Taketa suggested that plaintiff exercises poor judgment in food shopping, and that while she can cook simple meals, she could not cook a full course meal by herself. Tr. 342.

Taketa expressed her opinion that plaintiff was a wonderful mother and was really good to her baby. Tr. 343. She described plaintiff as taking care of the baby's needs. Id.

IV.  Vocational Expert Testimony

Patricia Ayerza testified at the hearing as a Vocational Expert (VE). The ALJ posed the following hypothetical to the VE: a claimant with no demonstrated exertional impairments, but with non-exertional impairments including a simple routine repetitive or unskilled work environment with little public contract, who could work alone and not part of a team to complete her own assignments and tasks. Tr. 356-57. In addition, the hypothetical claimant would be of plaintiff's age and possess her educational and prior work experiences. Tr. 357.

In response, the VE testified that such a person could perform the jobs of cannery worker and small products assembly. Tr. 357. She also identified agricultural produce sorting as an appropriate job that would fit the hypothetical. Tr. 358. She also stated that the hypothetical claimant could perform motel maid or dishwasher jobs. Id.

The ALJ then modified the hypothetical to include attention and concentration deficits at a marked level. Id. In response,

the VE testified that the hypothetical claimant could not perform any of the occupations she named in response to the original hypothetical. Id.

In response to questioning by plaintiff's attorney, the VE indicated that the hypothetical claimant could not perform any of the jobs recited by the VE if her manual dexterity were in the lowest tenth percentile. Tr. 359.

THE ALJ'S DECISION

The ALJ found that plaintiff had not engaged in any substantial gainful activity. Tr. 19, 27. The ALJ then found that plaintiff had the severe impairment of borderline intellectual functioning. Tr. 21, 27. While finding the impairment to be severe, the ALJ concluded that it did not meet or equal, either alone or in combination with other non-severe impairments, any listed impairment. Id.

The ALJ determined that plaintiff had the RFC to perform simple, routine, repetitive, unskilled work involving little public contact and which is performed alone and not part of a team. Tr. 25, 27. He further determined that she has no exertional limitations. Id.

In reaching his RFC determination, the ALJ rejected plaintiff's testimony suggesting she was incapable of holding a job. The ALJ concluded that while plaintiff has some difficulty related to cognitive/intellectual functioning, some of her statements concerning her impairment and its impact on her ability to work were not fully credited. In support of this conclusion, the ALJ discussed that the objective medical evidence did not fully support claimant's assertions of totally disabling symptoms and

19 - FINDINGS & RECOMMENDATION

limitations, that plaintiff's activities of daily living did not show more than mild limitations in functioning, that plaintiff's difficulties in social functioning were generally mild, and that the record established that plaintiff's difficulties in maintaining concentration, persistence, and pace were moderate at worst.  Tr. 23-24.

The ALJ also declined to give much weight to plaintiff's mother's testimony.  Tr. 22-23.  He concluded that the credibility of her testimony was undermined by her desire to help her daughter and by her own cognitive limitations.  Tr. 23.

Based on his RFC, the ALJ, relying on the VE's testimony, concluded that while plaintiff had no past relevant work, plaintiff could perform the jobs of cannery worker, small products assembly worker, and agricultural production sorter.  Tr. 25-26.  The ALJ also identified maid and dishwasher as jobs that plaintiff could perform.  Tr. 26.  In reaching this decision, the ALJ rejected plaintiff's argument that these jobs require aptitudes exceeding plaintiff's general learning aptitude and her aptitude in verbal, numerical, and manual dexterity.  Tr. 26.  This issue is further discussed below.  Based on the conclusion that plaintiff could perform the jobs identified by the VE, the ALJ concluded that plaintiff was not disabled.

### STANDARD OF REVIEW & SEQUENTIAL EVALUATION

A claimant is disabled if unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).

20 - FINDINGS & RECOMMENDATION

Disability claims are evaluated according to a five-step procedure. <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1395 (9th Cir. 1991). The claimant bears the burden of proving disability. <u>Swenson v. Sullivan</u>, 876 F.2d 683, 687 (9th Cir. 1989). First, the Commissioner determines whether a claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled. <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b). In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments." <u>Yuckert</u>, 482 U.S. at 140-41; <u>see</u> 20 C.F.R. §§ 404.1520(c), 416.920(c). If not, the claimant is not disabled.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." <u>Yuckert</u>, 482 U.S. at 141; <u>see</u> 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four. <u>Yuckert</u>, 482 U.S. at 141.

In step four the Commissioner determines whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can, he is not disabled. If he cannot perform past relevant work, the burden shifts to the Commissioner. In step five, the Commissioner must establish that the claimant can perform other work. <u>Yuckert</u>, 482 U.S. at 141-42; <u>see</u> 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f). If the Commissioner meets its burden and proves that the claimant is able to perform other work which exists in the national economy, he is not disabled. 20

21 - FINDINGS & RECOMMENDATION

C.F.R. §§ 404.1566, 416.966.

The court may set aside the Commissioner's denial of benefits only when the Commissioner's findings are based on legal error or are not supported by substantial evidence in the record as a whole. Baxter, 923 F.2d at 1394. Substantial evidence means "more than a mere scintilla" but "less than a preponderance." Id. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Id.

DISCUSSION

Plaintiff alleges that the ALJ committed several errors. The alleged errors can be divided into three groups: (1) errors at step two of the sequential evaluation when the ALJ allegedly incompletely assessed plaintiff's impairments and in particular, failed to recognize her depression as a severe impairment with significant vocational ramifications; (2) errors at step three of the sequential evaluation when the ALJ allegedly improperly concluded that plaintiff did not meet or equal a listed impairment and did not properly consider the combination of her impairments; and (3) errors at step five of the sequential evaluation when the ALJ allegedly improperly determined that plaintiff can perform jobs identified by the VE. I address plaintiff's arguments in turn.

I.  Step Two Errors

As noted above, in step two of the sequential evaluation the ALJ determines whether the claimant has a medically severe impairment. Here, the ALJ engaged in a fairly lengthy discussion of whether plaintiff's impairments were severe. The ALJ correctly noted that an impairment is severe within the meaning of the regulations if it imposes significant restrictions in the ability

22 - FINDINGS & RECOMMENDATION

to perform basic work activities. Tr. 19; 20 C.F.R. §§ 404.1520(c), 404.1521(a) ("an impairment is not severe if it does not significantly limit [the claimant's] physical ability to do basic work activities[.]").

The ALJ initially discussed the evidence regarding plaintiff's cognitive/intellectual functioning, citing assessments by Dr. Greenough in March 2001 and Dr. Lyon in May 2002. Tr. 19-20. He also considered the records from the Columbia Gorge Center. Tr. 20. Additionally, he discussed Dr. Davis's testimony. Tr. 20-21.

The ALJ noted plaintiff's argument that she was disabled based in part on depression and back problems. Tr. 20. He noted that in the spring of 2001, following a fall 2000 automobile accident, she was diagnosed with major depressive episode and began taking an anti-depressant medication. Id. The ALJ noted that the medical records indicated that plaintiff's depression responded well to medication, but that she stopped taking it during her pregnancy in 2002. Id. The ALJ further noted that in September 2002, after the delivery of her baby, the depression was reported to be mild and plaintiff restarted the anti-depressant medication. Id.

The ALJ discussed plaintiff's complaints of low back pain and noted that she was diagnosed with chronic low back pain, was prescribed medication, and was referred for chiropractic treatment. Id. As for her hand numbness, he described plaintiff's report in March 2001 of right hand numbness, but noted that the medical record did not establish continued and ongoing reports of right hand numbness. Id.

Based on this evidence and discussion, the ALJ concluded that plaintiff's only severe impairment was borderline intellectual

functioning.  Tr. 21.

Plaintiff contends that the ALJ improperly discounted the severity of her depression and that the ALJ failed to recognize her other mental impairments such as an adjustment disorder and a somatization disorder.

As to the depression, plaintiff correctly notes that the ALJ appeared to tie her depression to the fall 2000 car accident. Plaintiff argues that this was error because her health care providers consistently noted a long history of depression and her depressive symptoms continued long after the accident.

I disagree with plaintiff.  The record supports the ALJ's finding that plaintiff first reported symptoms of depression in the spring of 2001, following the fall 2000 car accident.  Tr. 255 (Wilson performed depression screening, diagnosed plaintiff with a major depressive episode, and prescribed Effexor in March 2001); 253 (Wilson noted in April 2001 that plaintiff's depression symptoms began around October 2000, after a motor vehicle accident).  To the extent plaintiff argues that her depressive symptoms preexisted the fall 2000 auto accident, the argument is not supported by the record.

The record also supports the ALJ's finding that plaintiff's depression responded well to medication.  Tr. 248 (Dr. Mishra noting in September 2002, two weeks after plaintiff delivered her baby, plaintiff's long history of depression and that it had responded well in the past to Effexor).  The record further supports the ALJ's finding that in September 2002, plaintiff's depression was reported to be mild.  Id.

While the record supports plaintiff's assertion that her

24 - FINDINGS & RECOMMENDATION

"depressive symptoms continued long after the car accident," e.g., Tr. 248 (Dr. Mishra noting in September 2002, almost two years after the car accident, that plaintiff had mild depression), the persistence of such symptoms does not contradict the ALJ's conclusion that plaintiff's depression is not severe. The record supports the ALJ's determination that plaintiff's depressive symptoms are mild or are rendered mild by use of anti-depressant medication.[2]  Thus, the ALJ did not err in concluding that plaintiff's depression is not a severe impairment.

Plaintiff also contends that the ALJ erred by not recognizing her "somatization disorder" as a severe impairment.  The only reference in the record to a "somatization disorder" is in Wilson's March 26, 2001 chart note in which his assessment list reads "1. Dysesthesia, R hand, in pt with suspected depression and a Hx of somatization."  Tr. 254.

I reject plaintiff's argument that the ALJ erred by not finding a somatization disorder as a severe impairment.  First, Wilson's chart note does not make a diagnosis of any kind of disorder, but merely references a history of somatization.  Second,

_____

[2]  Plaintiff suggests that her "cognitively-related inability to manage her medications" negates any benefit from what would be an effective medication.  She cites to a chart note indicating that she was started on Depo-Provera as a birth control method because she forgot to take birth control pills, and  to a separate chart note indicating that she stopped taking her anti-depressant Effexor on one occasion because she ran out of it.  Tr. 173, 253.  Neither of these chart notes supports her argument that she has a cognitively-related inability to manage her medications.  It is common knowledge that many women of all intellectual abilities forget to take their birth control pills. And, neither chart note attributes her failure to take her medication to her borderline intellectual functioning.

25 - FINDINGS & RECOMMENDATION

the statute provides that any impairment, severe or not, must be demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). Here, there are no chart notes reflecting the source of Wilson's comment regarding plaintiff's history of somatization. It is not known if his comment is based on plaintiff's self-report of such a history, on a previous assessment by Wilson, or on a diagnosis by a different medical professional at a different time with Wilson obtaining his knowledge through a chart review. Without such evidence in the record, I cannot determine if Wilson's reference to a history of somatization is supported by medically acceptable clinical techniques. There is nothing in Wilson's chart note suggesting that this history of somatization is severe, and his note is in reference to an apparently transitory condition of impaired sensation in plaintiff's right hand. Given the lack of evidence in the record, the ALJ did not err in failing to find plaintiff's alleged somatization disorder to be a severe impairment.

As to plaintiff's "adjustment disorder with depressed mood," there are two references in the record to this problem. First, Hanlon noted, in April 2001, that plaintiff "does carry a Dx of adjustment disorder, with depressed mood[.]" Tr. 252. This comment was made in the context of a clinic visit in which plaintiff came in for problems with depression and shakiness which she attributed to anti-depressant medication prescribed by Wilson. Id.

The second reference is by Dr. Irvine in December 10, 2001, when he examined her for her complaint of abdominal pain. Tr. 249. In his "plan," he stated that he was prescribing Wellbutrin for

26 - FINDINGS & RECOMMENDATION

plaintiff's "adjustment disorder, depressed mood, and tobacco abuse[.]" Id.

Dr. Irvine's reference is somewhat ambiguous in that it is unclear if he referred to "adjustment disorder, depressed mood," as one problem or two separate problems. In any event, the ALJ failed to mention Hanlon's or Dr. Irvine's references to any adjustment disorder. It is unclear from the record whether either or both of Hanlon's and Dr. Irvine's notes refer to the same depression noted by Wilson beginning in March 2001, or whether they refer to a separate, independent condition. Because of the ambiguity, I cannot say on this record that the ALJ erred or did not err in not finding the adjustment disorder with depressed mood to be a severe impairment. At a minimum, I conclude that the ALJ should have discussed the disorder given that two practitioners, one of whom is a medical doctor and thus, an acceptable medical source, referred to the disorder, and actually prescribed medication for it. This issue should be remanded to the ALJ.

My conclusion is also warranted by Dr. Davis's testimony. In discussing plaintiff's impairments during the hearing, he stated that in his opinion, there had been an inadequate study of her emotional disturbance, if any. Tr. 348. He noted that there had been a lot of focus on plaintiff's "low IQ and things like that[.]" Id. He opined that based on the information regarding plaintiff's intellectual functioning, she did not meet a listed impairment, but, he explained, he believed he did not have "adequate information." Tr. 349. He articulated a hope for "some further study[.]" Id. This testimony supports a remand for the ALJ to consider the references in the record to plaintiff's adjustment

disorder with depressed mood and to further evaluate her emotional disturbance as suggested by Dr. Davis.

The step two analysis also requires the ALJ to determine if the claimant, who may not have a single severe impairment, has a combination of impairments which is severe. 20 C.F.R. § 416.920(a)(4)(ii) (claimant will be found not disabled if claimant does not have a severe medically determinable physical or mental impairment or a combination of impairments that is severe); 20 C.F.R. § 416.923 (agency must consider the combined effect of all impairments, both severe and non-severe).

Plaintiff contends that even if the ALJ properly assessed her borderline intellectual functioning as her only severe impairment, the ALJ erred in not considering plaintiff's other mental impairments of somatization disorder and adjustment disorder with depressed mood, in combination with her borderline personality disorder. The ALJ does not appear to have directly addressed this issue.

At step three, the ALJ did conclude that plaintiff had no impairment or combination of impairments that meets or equals any listed impairment. Tr. 21. However, there is no separate discussion of whether, at step two, the ALJ considered whether plaintiff's impairments, independently severe or not, were severe in combination. Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996) (important to note that at step two inquiry, "the ALJ must consider the combined effect of all of the claimant's impairments on her ability to function, without regard to whether each alone was sufficiently severe"). While the ALJ's conclusion that plaintiff's depression is not a severe impairment is supported in

28 - FINDINGS & RECOMMENDATION

the record, the ALJ should have discussed whether her mild depression, in combination with her borderline intellectual functioning, resulted in a severe impairment.[3]

II.   Step Three Errors

In step three, the ALJ assesses whether a claimant's impairment(s) or combination of impairments meets or equals an impairment under 20 C.F.R. pt. 404, subpt. P, App. 1.  20 C.F.R. § 416.920(a)(4)(iii).  Here, the ALJ concluded that plaintiff had no impairment or combination of impairments that meets or equals the criteria of any of the impairments listed in Appendix 1.  Tr. 21.

The ALJ relied on Dr. Davis's testimony that plaintiff did not have an impairment or combination of impairments that met or equaled Listing 12.05.  Id.  The ALJ explained that he (the ALJ), considered all of the listings of Appendix 1, particularly Listings 12.05C and 12.05D.  Id.  However, he found that the record did not establish that plaintiff had a physical or other mental impairment imposing additional and significant work related limitations of functioning or that plaintiff had marked limitations in activities of daily living, social functioning, or concentration, persistence, or pace.  Id.

Listing 12.05 addresses mental retardation impairments.  It provides that a claimant will be considered disabled if he or she satisfies one of four criteria.  Plaintiff argues that her combination of borderline personality disorder, depression, or

---

[3]  If the ALJ, upon remand, finds the adjustment disorder with depressed mood condition noted by Hanlon and Dr. Irvine to be an impairment separate from the depression, the ALJ should also consider it in the assessment of the effect of the combination of plaintiff's impairments.

29 - FINDINGS & RECOMMENDATION

other emotional problems, meets or equals Listing 12.05C when considered in combination. Listing 12.05C provides for disability upon the showing of a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]" 20 C.F.R. pt. 404, subpt. P, App. 1, Listing 12.05C.

Plaintiff contends that she has a problem with decreased concentration which she alleges is a significant work-related limitation of function. On the present record, I reject plaintiff's argument.

In support of her position, plaintiff cites to a March 8, 2001 chart note by Wilson. At that visit, Wilson performed a depression screening on plaintiff and noted the following symptoms "evolving over the last [six months]:" sad mood with frequent crying spells, significant anhedonia, fatigue, insomnia, decreased concentration, decreased appetite, guilty ruminations, and psychomotor vegetation. Tr. 164. However, the record does not support a conclusion that any of these symptoms persisted at a "significant" level after plaintiff began taking anti-depressant medication which Wilson prescribed at that visit. Thus, on the record presented, the ALJ did not err in concluding that plaintiff's impairments did not meet or equal a listed impairment.

I note, however, that given the errors made by the ALJ in failing to more fully evaluate her adjustment disorder with depressed mood and in failing to fully assess the severity of the combination of any of her impairments, the record is incomplete and the ALJ's step two errors could have impacted the assessment at step three of whether plaintiff's impairments, either singly or in

combination, meet or equal a listed impairment. Thus, upon remand, the ALJ, after reevaluating plaintiff's claim at step two, should reevaluate the step three analysis as well.

## III. Step Five Errors

Plaintiff contends that the ALJ made the following errors at step five: (1) improperly rejected plaintiff's testimony; (2) improperly rejected plaintiff's mother's testimony; (3) improperly ignored Dr. Rethinger's functional assessment; (4) improperly concluded that plaintiff's mental aptitude is sufficient to perform the jobs identified by the VE; (5) improperly concluded that plaintiff has the manual dexterity to perform the jobs identified by the VE; and (6) failed to include all of plaintiff's limitations in the hypothetical presented to the VE, rendering the VE's testimony of no evidentiary value.

### A. Plaintiff's Testimony

Plaintiff objects to the ALJ's rejection of her testimony. As noted above, the ALJ rejected plaintiff's testimony for several reasons, including objective medical evidence that did not support plaintiff's claims, activities of daily living showing only mild limitations in functioning, and evidence establishing that particular limitations in concentration, persistence, and pace were moderate at worst. Tr. 23-24.

Plaintiff argues that the ALJ used the wrong standard to evaluate her testimony and cites to the following sentence in the ALJ's decision in support of her position: "[t]he objective medical evidence does not fully support the claimant's assertion of totally disabling symptoms and limitations." Tr. 23. Plaintiff argues that this shows that the ALJ used the wrong standard because

31 - FINDINGS & RECOMMENDATION

the Social Security Act does not require that disability claimants be totally disabled or unable to engage in any mental or physical activity.

I disagree with plaintiff's characterization of the ALJ's decision. The ALJ's statement is best understood as indicating that in his opinion, plaintiff's claim of disability was not supported by the objective medical evidence. I do not read the statement as a rejection of plaintiff's testimony for failing to establish total disability. As such, I do not read the statement as employing an erroneous standard of incapacity. Thus, plaintiff's argument is not well founded.

B. Lay Testimony

Lay testimony as to a plaintiff's symptoms or limitations is competent evidence which the Secretary must take into account. Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993). The ALJ may disregard such testimony if he or she gives reasons "germane to each witness." Id.

Here, the ALJ stated that he considered the testimony of plaintiff's mother, but discounted its weight because first, the relationship between plaintiff and her mother may have influenced her testimony due to the desire to help her daughter and second, her own cognitive limitations may have made her testimony unreliable in some fashion.

Even considering the relatively low threshold required to reject lay witness testimony, I conclude that the ALJ's reasons for rejecting plaintiff's mother's testimony are unsupportable. Accepting the ALJ's reasoning that the witness's status as the mother of the plaintiff is a basis for rejecting that witness's

testimony would render testimony by any parent, or any family member, suspicious and without weight. There is simply no support for such a categorical dismissal of such testimony. To paraphrase a previous decision by this Court regarding medical testimony, "[t]he Secretary may not assume that [family members] lie in order to help their [kin] collect disability benefits." Ratto v. Secretary, 839 F. Supp. 1415, 1426 (D. Or. 1993). Moreover, the Ninth Circuit has expressly rejected family member status as a basis for finding lay witness testimony in a social security case not credible. Smolen, 80 F.3d at 1289 ("The fact that a lay witness is a family member cannot be a ground for rejecting his or her testimony.").

As to plaintiff's mother's own cognitive limitations, the record does not support the ALJ's conclusion that such cognitive limitations, whatever they may be, affect her ability to accurately or honestly describe plaintiff's symptoms and limitations. The ALJ stated that plaintiff's mother's statements "may have been influenced by her . . . own cognitive limitations to which she testified[.]" Tr. 23.

The testimony regarding plaintiff's mother's disability was as follows:

> ALJ: Are you learning handicapped or mentally disabled as well? . . .
>
> WTN [plaintiff's mother]: Yeah. I'm on SSI Social Security myself . . . and stuff because it's, you know, it's hard and stuff, you know, for me to even learn. I even tried and tried to learn myself and stuff[.]

Tr. 339. There is no other testimony regarding her disability. At best, her testimony shows that plaintiff's mother has some kind of learning disability. It provides no basis for the ALJ's assumption

33 - FINDINGS & RECOMMENDATION

that plaintiff's mother is less than able to render honest and accurate testimony regarding her daughter's limitations. Accordingly, the ALJ erred in rejecting plaintiff's mother's testimony. The ALJ must reconsider this testimony upon remand.

C. Dr. Rethinger's Functional Assessment

In September 2001, non-examining DDS psychologist Paul Rethinger found plaintiff to be markedly limited in her ability to understand and remember detailed instructions, and moderately limited in her abilities to carry out detailed instructions, to interact appropriately with the general public, and to set realistic goals or make plans independently of others. Tr. 200-02. He also found that she had mild restrictions in daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. Tr. 196.

While the ALJ did not mention Dr. Rethinger by name, in his RFC assessment the ALJ noted that "the claimant may have some difficulty understanding more complex or detailed instructions." Tr. 24. He also found that she had moderate difficulties maintaining concentration, persistence, and pace. Id. He further noted that she had mild difficulty in the area of social functioning and had mild restrictions of activities of daily living. Tr. 23, 24.

The ALJ also referred to the findings of the DDS consultants and specifically noted that they "opined that she could understand and perform simple and short instructions and would work best out of the public eye." Tr. 23. The ALJ's RFC limited plaintiff to work involving little public contact. Tr. 25.

34 - FINDINGS & RECOMMENDATION

Plaintiff argues that the ALJ ignored some of Dr. Rethinger's limitations and contends that upon remand, the ALJ should be instructed to include all of Dr. Rethinger's assessed limitations in a proper vocational hypothetical. I disagree. The ALJ credited each of Dr. Rethinger's limitations. The only one not specifically mentioned or expressly incorporated into the RFC is Dr. Rethinger's moderate limitation on her ability to set realistic goals or make plans independently of others. However, any error in omitting an express discussion of this limitation is harmless because the RFC limiting plaintiff to simple, routine, repetitive, unskilled work is not inconsistent with a moderate limitation on goal setting or independent planning. Thus, I recommend concluding that plaintiff's argument regarding Dr. Rethinger's assessments is without merit.

D. Sufficiency of Plaintiff's Mental Aptitude to Perform Jobs Identified by the VE

The Dictionary of Occupational Titles (DOT) job descriptions for the jobs identified by the VE as being suitable for plaintiff contain a job description and then show percentiles and typical performances for various aptitudes. Tr. 139-147. For example, the cannery worker position, DOT number 529.686-014, contains a detailed description of duties followed by a table with headings of "Aptitudes," "Percentile", and "Typical Performance." Tr. 140. Eleven separate aptitudes are listed, including "general learning ability," "verbal," "numerical," "motor coordination," and "manual dexterity." Following the listed aptitude is a "score" of some sort, partially explained at pages 146-47. For example, following the listing for "verbal" aptitude on the cannery worker

35 - FINDINGS & RECOMMENDATION

description, the score "V-4" appears. Tr. 140. The explanation at page 146 states that

> "V" Score: Verbal aptitude is the ability to understand meaning of words and to use them effectively. The ability to comprehend language, to understand relationships between words, and to understand meanings of whole sentences and paragraphs.

Tr. 146. There is no explanation of the meaning of the number following the letter such as the "4" following the "V" in "V-4."

After the aptitude listings and the scores, the next column has percentiles. Tr. 140. In the cannery worker position table, the verbal aptitude has a 10 to 33 percentile. Tr. 140. Following the percentile column is a "typical performance" column which, for the verbal aptitude in the cannery worker job, states "below average." Id.

Plaintiff states, and defendant does not appear to disagree, that every job identified by the VE requires a verbal aptitude of at least the 10th percentile. Tr. 140-45. Plaintiff further states, and defendant does not disagree, that the cannery worker, agricultural produce worker, and motel maid positions all require a numerical aptitude of at least the 10th percentile. Id. The DOT records provided to the ALJ by the VE show that small products assembler also requires a numerical aptitude of at least the 10th percentile. Tr. 142.

Plaintiff argues that the evidence in the record shows that her intellectual abilities fall short of these percentile requirements. She notes that in March 2001, Dr. Greenough assessed a verbal IQ of 72, a performance IQ of 80, a full scale IQ of 74, a verbal comprehension index of 70, and a Wide Range Achievement test (WRAT) arithmetic standard score of 65. Tr. 159-60. In an

36 - FINDINGS & RECOMMENDATION

attempt to assist the ALJ in correlating these IQ scores to percentiles, plaintiff's then-counsel submitted a table from a publication entitled "Essentials of WAIS-III Assessment" by Alan S. Kaufman and Elizabeth O. Lichtenberger, on how to interpret the WAIS-III. Tr. 150-51. The table shows "National Percentile Ranks Corresponding to Scaled Scores." Tr. 151.

Relying on the table, plaintiff's then-counsel pointed out to the ALJ that Dr. Greenough's WAIS-III scaled score was 3 for plaintiff's vocabulary and was 5 for arithmetic. Tr. 148-49, 162. The table correlates a scaled score of 3 (vocabulary) to the 1st percentile and a scaled score of 5 (arithmetic) to the 5th percentile. Tr. 151. Plaintiff's then-counsel also pointed out that her 72 in verbal IQ correlated to something lower than the 5th percentile according to the table. Tr. 148-49, 151.

Plaintiff's then-counsel also submitted a different chart from an unknown source showing the relationship of the typical bell curve to various types of scores. Tr. 283-84. Included here is information showing the relationship between IQ scores, standard deviation, and percentiles. Tr. 284. For example, an IQ of 70 is two standard deviations below the mean and is at the 2.3 percentile. Id. Plaintiff's then-counsel pointed out to the ALJ that based on this chart, plaintiff's March 2001 full scale IQ of 74 is below the 5th percentile. Tr. 283.

In his decision, the ALJ accurately noted plaintiff's contention that the jobs identified by the VE require aptitudes exceeding plaintiff's general learning aptitude and her aptitude in verbal, numerical, and manual dexterity. Tr. 26. The ALJ also noted plaintiff's reliance on the information from the book by

37 - FINDINGS & RECOMMENDATION

Kaufman and Lichtenberger.  Id.

But, the ALJ rejected plaintiff's argument because, he explained, "no information is provided to show the accuracy or reliability of the conversion of the claimant's test scores to percentage rankings using the excerpts that [the attorney] has selected or whether or not such rankings are, or even can be, accurately correlated or compared to the DOT aptitude requirements."  Tr. 26.  The ALJ concurred with the testimony of Dr. Davis and the VE rather than accepting plaintiff's argument.

There are at least two problems with the ALJ's analysis. First, assuming the ALJ meant that he concurred with Dr. Davis's testimony regarding the correlation of plaintiff's raw IQ and scaled IQ scores to percentiles, a review of the transcript of this testimony shows that Dr. Davis's opinions were speculative.  In response to questioning by plaintiff's then-counsel regarding the percentage ranking for various scores, Dr. Davis stated that he would "have to get the book in order to answer . . . with any type of accuracy."  Tr. 351.  Although he agreed with plaintiff's counsel who, consulting a book, queried whether a WAIS scaled score of 6 equaled a 9th percentile, his responses to other questions of this nature were not made with reference to any authority. Tr. 351-52.

In response to a question of what the percentile was for an IQ of 72, he indicated it was the 9th percentile, "pretty much," and then said it was "[o]h. Maybe ten. Ninth, tenth, eleventh.

Somewhere in there." Tr. 352.[4]  Clearly, Dr. Davis's testimony on this issue, made without reference to "the book" he himself stated he needed to have for his opinions to be accurate, is unreliable.

As to the VE testimony, plaintiff's then-counsel questioned the VE at the hearing regarding the aptitude percentiles required for the various DOT positions she identified at the hearing.  Tr. 360-61.  Plaintiff's counsel asked if any of the identified jobs would be eliminated by numerical and verbal aptitudes in the lowest ten percent.  Tr. 360.  The VE began to look up the percentiles for each of the identified jobs and began with the numerical aptitude percentile for cannery worker which she stated was from the 10th to the 33rd percentile.  Tr. 361.  Under pressure from the ALJ to speed up her testimony because he did not have time to go through this for each job, the VE offered to "print [the DOT information] out."  Tr. 362.  Plaintiff's counsel also offered to obtain the DOT job numbers from the VE and then submit post-hearing data.  Id. Both the VE and plaintiff's then-counsel submitted DOT job data with the relevant aptitude percentiles after the hearing.  Tr. 139-47; 148-56.

The problem with the ALJ's reliance on the VE's testimony is that her oral presentation at the hearing was cut short and the written materials she submitted post-hearing are ambiguous because they lack an interpretation of the DOT aptitude requirements which is required to compare them to the relevant IQ data, a comparison the evidence suggests is necessary to determine if plaintiff is

---

[4]  In contrast, the authorities submitted by plaintiff show that an IQ of 72 is below the 5th percentile.  Tr. 151, 254.

39 - FINDINGS & RECOMMENDATION

qualified to perform the jobs identified by the VE.

The ALJ has a duty to develop the record, even when the claimant is represented by counsel. Smolen, 80 F.3d at 1288. The duty is triggered when there is ambiguous evidence. Mayes v. Massanari, 276 F.3d 453, 459-60 (9th Cir. 2001). Moreover, the ALJ has a duty to investigate whether a VE's opinion conflicts with information in the DOT and then elicit an explanation for any inconsistency. Haddock v. Apfel, 196 F.3d 1084, 1090 n.2 (10th Cir. 1999); Soc. Sec. Ruling ("SSR") 00-4p, 2000 WL 1898704 (indicating that if there is a conflict between VE evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on VE evidence to support a disability determination).

Plaintiff's IQ scores are undisputed. Plaintiff's evidence indicates that these scores are readily transferrable to percentiles which may be easily discerned by reference to different publications. The ALJ rejected plaintiff's argument because in his opinion, plaintiff's evidence failed to show the correlation or comparison of the IQ scores and their percentiles as shown in plaintiff's charts to the DOT aptitude requirements and the percentiles shown in the DOT information provided by the VE.

What plaintiff's evidence does show, however, is a possible conflict between the VE's testimony about the jobs plaintiff can perform and the DOT requirements. Given that, the ALJ was obligated to further inquire of the VE regarding the DOT aptitude requirements and the DOT percentiles. The VE is the expert who should explain to the ALJ whether the percentiles commonly used as an interpretation of IQ scores are the same percentiles attributed

by the DOT to the various aptitudes required for the identified jobs. Without this evidence, the ALJ cannot make a reasonable interpretation of the evidence that was before him. The ALJ erred by failing to elicit such testimony from the VE.

     E.  Plaintiff's Manual Dexterity

     During the hearing, plaintiff's then-counsel queried the VE regarding the DOT manual dexterity percentile requirements for the jobs identified by the VE.  Tr. 359-60.  In response to the questioning, the VE stated that the motel maid and dishwasher positions required manual dexterity in the 10th to 33rd percentiles.  Id.  The post-hearing DOT information submitted by the VE to the ALJ shows that the cannery worker, agricultural produce sorter, and small products assembler all require manual dexterity in the 34th to 65th percentiles.  Tr. 140-42.

     Before her December 2002 hearing, plaintiff submitted the results of a February 2000 career preference test to the Social Security Administration.  Tr. 132-135A.  In the cover letter accompanying the evidence, plaintiff's then-counsel noted that the title of the test was the "Career Occupational Preference System" or COPS.  Tr. 132.  He indicated that the attached summary of results was four pages and that the third page included a "CAPS Ability Profile" showing that plaintiff was in the lowest 10% in the following abilities:  numeric ability, language usage, word knowledge, and manual speed and dexterity.  Id.[5]  This evidence

_____

     [5]  I cite to the cover letter instead of to the actual test results because that page appears to be missing from the record. The cover letter and its attachments are Exhibit 18E which the record indicates is five pages.  Tr. 132.  Page four is missing. Upon remand, the record should be amended to include the missing

provided the basis for plaintiff's argument to the ALJ that she lacks the manual dexterity to perform any of the jobs identified by the VE.

The ALJ did not credit plaintiff's evidence. He stated that (1) the test was completed in February 2000, more than one year before her protected application date of June 11, 2001; (2) no information was provided regarding the circumstances or conditions under which the test was administered or completed and no information was provided regarding the particular test or its accuracy and reliability; and (3) there was no information showing a correlation between the test results and the DOT requirements or a commonality between the terms or results for purposes of comparison. Tr. 26.

I agree with plaintiff that the ALJ erred. First, while the test was administered before her protected filing date, it was nonetheless after her alleged onset date of October 1, 1999, making it relevant to her disability determination. Second, as with the verbal and numeric aptitude evidence, the evidence plaintiff submitted to the ALJ at a minimum raises the question of whether plaintiff can perform the jobs identified by the VE with her level of manual dexterity. The DOT undisputedly provides that plaintiff must have manual dexterity in at least the 10th percentile to perform several of the identified jobs, and in some cases must have manual dexterity in at least the 34th percentile. If the record establishes that plaintiff's manual dexterity is below that level, then the VE's testimony is not supported by the DOT. The burden is

page.

on the ALJ to elicit the necessary information from the VE to make a final determination regarding plaintiff's manual dexterity. The ALJ failed to do so. Remand is appropriate.

F. VE Hypothetical

Plaintiff argues that the vocational hypothetical did not include all of plaintiff's limitations and thus is invalid. Nguyen v. Chater, 100 F.3d 1462, 1466 n.3 (9th Cir. 1996) (incomplete hypothetical does not constitute competent evidence to support a finding that claimant can do jobs set forth by VE).

Given my recommendation that this case be remanded for the ALJ to address the issue of plaintiff's adjustment disorder with depressed mood, to consider plaintiff's mother's testimony, and to seek additional testimony from the VE regarding the DOT aptitude requirements, I need not separately address the validity of the hypothetical. The evidence submitted post-remand on the relevant issues will dictate whether the hypothetical used in the December 2002 hearing was valid or invalid.

IV. Post-Decision Evidence Submitted to the Appeals Council

After the ALJ's decision, and while the case was on appeal to the Appeals Council, plaintiff submitted additional evidence to the Appeals Council, including an employer questionnaire, a table showing percentile ranks for deviation IQs, and a "CAPS Manual." Tr. 299-315. Plaintiff cites to this evidence in support of her arguments in this case. Defendant argues that this Court cannot consider the evidence and to the extent this evidence may be considered at all, it is only pursuant to a remand under 42 U.S.C. § 405(g) after plaintiff shows that the evidence is new and material and establishing that there is good cause for her failure

43 - FINDINGS & RECOMMENDATION

to submit the evidence earlier.

If I understand it correctly, defendant's argument is that because a denial of review by the Appeals Council is not a final decision, district courts do not have jurisdiction to consider an Appeals Council's denial of review and without such jurisdiction, a district court's jurisdiction to review evidence submitted to the Appeals Council must comply with the requirements set forth in section 405(g). Although defendant cites cases from other circuits for the proposition that a district court lacks jurisdiction to review an Appeals Council's denial of review because the denial of review is not a final decision, defendant fails to cite any cases supporting its position that in such cases, the district court may not consider evidence submitted to the Appeals Council.

Moreover, defendant's argument is contrary to the Ninth Circuit's decision in Ramirez v. Shalala, 8 F.3d 1449, 1451-52 (9th Cir. 1993). There, the plaintiff requested that the Appeals Council review the ALJ's denial of his disability claim. Id. at 1451. The plaintiff submitted an additional report from his treating psychologist to the Appeals Council that he had not submitted to the ALJ. Id. The Appeals Council denied review, making the ALJ's decision final. Id.

The district court affirmed the ALJ and the plaintiff appealed. The Ninth Circuit stated that it considered "the rulings of both the ALJ and the Appeals Council." Id. It explained that although the Appeals Council "declined to review" the ALJ's decision, the Appeals Council reached its "declined to review" ruling after considering the case on the merits, examining the entire record, including the additional material, and concluding

44 - FINDINGS & RECOMMENDATION

that the ALJ's decision was proper and that the additional evidence failed to provide a basis for changing the ALJ's decision. _Id._ at 1452. The court then concluded that "[f]or these reasons, we consider on appeal both the ALJ's decision and the additional material submitted to the Appeals Council." _Id._

Such is the case here. The Appeals Council considered the case on the merits, examined the entire record, including the material sent post-hearing to the Appeals Council by plaintiff's then-counsel, and concluded that the record, including the new evidence, did not provide a basis for changing the ALJ's decision. Tr. 5-9. If "these reasons" were sufficient for the Ninth Circuit to review both the ALJ's decision and the material submitted directly to the Appeals Council in _Ramirez_, they are sufficient for this Court to review both the ALJ's decision and the evidence submitted post-hearing to the Appeals Council in the instant case. In any event, the material should be considered by the ALJ upon remand.

CONCLUSION

I recommend that the ALJ's decision be remanded for reconsideration of the issues identified herein. I further recommend that should the Article III District Court Judge adopt this Findings & Recommendation, a Judgment reversing and remanding the case pursuant to sentence four of section 405(g), be entered.

SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due July 15, 2005. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

45 - FINDINGS & RECOMMENDATION

1    If objections are filed, a response to the objections is due

2  July 29, 2005, and the review of the Findings and Recommendation

3  will go under advisement on that date.

4    IT IS SO ORDERED.

5              Dated this  30th  day of  July  , 2005.

6

7                        /s/ Dennis J. Hubel

8                        _____
9                        Dennis James Hubel
                         United States Magistrate Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

46 - FINDINGS & RECOMMENDATION